**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT L. LONGO JR., | : | Civil No. 3:22-cv-1199 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| HANNAH TROSTLE, RNS, MR. | : | |
| ARQUELLES, PA, DR. VOORSTAD, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Plaintiff Robert Longo ("Longo"), an inmate housed at the State Correctional Institution, Camp Hill, Pennsylvania ("SCI Camp Hill"), commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide adequate medical care for his back pain. (Doc. 1). Longo subsequently filed a supplement to the complaint. (Doc. 27). The remaining Defendants are Theodoor Voorstad, M.D. and Miguel Arguelles, certified registered nurse practitioner ("CRNP").

Presently pending before the Court is a motion (Doc. 39) for summary judgment by Defendants Voorstad and Arguelles. The motion is ripe for resolution. For the reasons set forth below, the Court will grant the motion.

## I.   **Statement of Undisputed Facts[1]**

In his original complaint and amended complaint, Mr. Longo alleges that the Medical

Defendants violated his federal constitutional rights by being deliberately indifferent to his

need for treatment for his lower back pain from April 2021 through October 2021.  (Doc. 40

¶ 2).  He also raises a state law negligence claim.  (*Id.*).

On January 3, 2020, Mr. Longo was seen by LPN Charles Bartosavage to complete

a medical release form.  (*Id.* ¶ 4).  Per the release, Mr. Longo had no activities of daily living

(ADL) restrictions in place.  (*Id.*).  On January 3, 2020, Mr. Longo authorized SCI Retreat

permission to release his medical and dental records for a continuation of care to the PA

Board of Probation and Parole.  (*Id.* ¶ 5).

On February 5, 2020, Kortnee Green noted in Mr. Longo's chart that his blood was

drawn for various lab tests.  (*Id.* ¶ 6).  On February 10, 2020, Dr. Rinehouse ordered Mr.

Longo's annual lab test for his antipsychotic medication.  (*Id.* ¶ 7).  On March 16, 2020, Mr.

Longo was seen by Donald O'Brian, PA at sick call at SCI Retreat.  (*Id.* ¶ 8).   He

---

[1]    Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  Unless otherwise noted, the factual background herein derives from the parties' statements of material facts and exhibits.  (Docs. 40, 46).

Longo generally agrees that he was treated by Defendants Voorstad and Arguelles, though he claims that the treatment was inadequate and proper relief was denied.  (*See* Doc. 46).  Longo also asserts that paragraphs 4-13, 15-31, 34, 36, 38, 42, 46-62, 64-66, 68, 70-72, 74-75, 77-78, 81-84, 86, 88, 90-98, and 101-103 of Defendants' statement of material facts are irrelevant to the claims before the Court.  (Doc. 46 ¶¶ 4, 6, 9, 11, 13, 17, 21, 23, 25, 27, 29, 31, 34, 36, 38, 40, 43).

complained of episodic headaches for several weeks and low back pain for about one week which he attributed to working in the tray room. (*Id.*). Longo reported that he used Motrin for pain, but it did not provide any relief. (*Id.*). Mr. Longo specifically stated, "I am in serious pain to where I'm about to cry." (*Id.*). On examination, PA O'Brien observed that Mr. Longo was alert, awake and oriented, ambulated, moved his torso and extremities x 4 without apparent discomfort or difficulty and he had fluid motions without hesitancy. (*Id.*). He also noted that Mr. Longo's left upper lumbar area had tightness medially and he did not have ecchymosis or erythema. PA O'Brien's assessment was for lumbar strain and headache. (*Id.*). Per the plan, PA O'Brien gave Mr. Longo Motrin, ordered him Robaxin and administered the 1st dose at this visit. (*Id.*). He also advised Mr. Longo to apply hot moist compresses, begin gentle stretching exercises on March 17, ordered him a lay-in for 2 days, and instructed him to return to care if his symptoms increased and/or on an as needed basis. (*Id.*).

In advance of his transfer from SCI Retreat to SCI Camp Hill, Mr. Longo's records were scheduled for transfer. (*Id.* ¶ 9). On March 26, 2020, Mr. Longo was transferred from SCI Retreat to SCI Camp Hill. (*Id.* ¶ 10). On arrival, he was examined by Allison Zawicki, RN. (*Id.*). She noted he had no signs/symptoms of influenza type illness, and his temperature was 97.5 degrees. (*Id.*). On March 26, 2020, Mr. Longo was seen by Jasmin Bo Dunham, RN for running a temperature upon his arrival to SCI Camp Hill from SCI Retreat. (*Id.* ¶ 11). RN Dunham noted he was afebrile and denied any signs/symptoms of

3

the flu or COVID-19. (*Id.*). Her assessment was for temperature taken per protocol. (*Id.*). The plan was for Mr. Longo to be monitored on an as needed basis. (*Id.*).

On March 27, 2020, Sheri Bolton completed a reception progress note. (*Id.* ¶ 12). She also provided a copy of the self-medication distribution program instructions for Mr. Longo. (*Id.*).

On March 30, 2020, Timothy Rutherford, PA noted in Mr. Longo's chart that, due to the statewide lockdown secondary to COVID-19, Mr. Longo's sick call slip was reviewed (without the patient being seen automatically per normal routine). (*Id.* ¶ 13). Per the record, Mr. Longo requested ibuprofen for his back pain and two days off work (Mr. Longo was no longer working due to the statewide lockdown). (*Id.*). He further noted that new orders were entered, and Mr. Longo would be notified during block-to-block rounds on this date. (*Id.*).

On April 6, 2020, Mr. Longo was seen by CRNP Arguelles, on L Block, during lockdown round for a non-urgent sick call. (*Id.* ¶ 14). Longo requested sick call for chronic back pain, reported that he had taken Motrin in the past but it provided no relief, and he requested a stronger pain medication. (*Id.*). Longo otherwise denied a fever or chills or any acute discomfort. (*Id.*). The plan was for Mr. Longo to be seen on the doctor's line for follow-up care for chronic back pain. (*Id.*).

On June 26, 2020, Mr. Longo was released to general population. (*Id.* ¶ 15). Per the release, he had no restricted activities of daily living (ADLs). (*Id.*).

4

On July 9, 2020, Mr. Longo was seen by Karen Gordon, CRNP. (*Id.* ¶ 16). Per the record, CRNP Gordon noted he submitted a DC-138a complaint of non-healing sores, reporting he had ulcers on both feet, a wound on his right forearm from a popped pimple, and a sore on his lips. (*Id.*). CRNP Gordon further noted that she reviewed his medical records, including lab results, imaging studies, medications, allergies, and vital signs. She saw him at his cell due to the COVID-19. (*Id.*). She further noted he reported he tried triple antibiotic cream, which was not beneficial, having sores that take months to heal, experienced excessive thirst and frequent urination, and felt shaky when he skipped meals. (*Id.*). Mr. Longo also reported having a strong family history of diabetes. (*Id.*). CRNP Gordon examined him noting he had no signs of acute distress, his respirations were even and non-labored, he did not have audible wheezing and was able to speak in full sentences, etc. (*Id.*). Her assessment was of skin ulcers in various stages of healing, polydipsia, and polyuria. (*Id.*). The plan was to order him a repeat-fasting glucose lab test since his 2/2020 results were high but normal and he was symptomatic. (*Id.*).

On August 26, 2020, Mr. Longo was seen by Dr. Voorstad for a referral for diabetes mellitus ("DM"). (*Id.* ¶ 17). Dr. Voorstad noted that Mr. Longo reported his symptoms as being thirsty and drinking in the last few months, tending to have wounds which healed slowly and his wounds were more at his ankles and lower forearms, stating also that he tended to have wounds on his back, and reported he has changed soaps and detergents without improvement. (*Id.*). Dr. Voorstad also noted that Mr. Longo had a history of

5

psychiatric illness, admitted he is easily anxious, and he drinks a few cups of coffee each day.  (*Id.*).  On examination, Mr. Longo was alert, oriented, and not in acute distress, had a few slightly excoriated small wounds at his feet, ankles, and wrists and a small one across his lower back.  (*Id.*).  Dr. Voorstad further noted that Mr. Longo's February labs revealed his blood sugar level was 99 and his labs from yesterday revealed his blood sugar level was 90.  (*Id.*).  Dr. Voorstad concluded that he did not have diabetes, and reassured Mr. Longo.  (*Id.*).  He did note possible folliculitis, and the potential that his wounds were the result of his scratching from anxiety.  (*Id.*).  He counseled Mr. Longo, advised him to avoid coffee, prescribed him Doxycycline 100 mg to be taken 2 times per day for 10 days, and instructed him to return to the sick line if there was no improvement.  (*Id.*).

On October 9, 2020, Mr. Longo was seen and evaluated by Edwin Mungai, CRNP outside his cell door due to the mandated COVID-19 enhanced isolation protocol.  (*Id.* ¶ 18).  Generally, blood sugar of 70-100 is the normal range for an average adult.  (*Id.*).  Mr. Longo complained of an infected nonhealing wound on his right upper arm and cellulitis around his right heel.  (*Id.*).  On examination, he was in no acute distress, and ambulated to his cell door without any difficulties.  (*Id.*).  His right arm had a wound with whitish drainage.  (*Id.*).  His right heel had noted redness but no open areas.  (*Id.*).  CRNP Mungai prescribed Mr. Longo the antibiotic Sulfatrim to be taken twice per day until October 18, instructed him to perform wound care with hydrogen peroxide and apply antibiotics to his right arm wound, and directed him to return for follow-up care if his symptoms worsened.  (*Id.*).

On October 10, 2020, Mr. Longo was seen by Beverly Jenrette-McDowell, RN. (*Id.* ¶ 19). At that visit, he reported "I don't know what happened." (*Id.*). RN Jenrette cleansed the right arm wound site with peroxide and applied a new dressing, per orders. (*Id.*). Mr. Longo tolerated the treatment well and did not complain of pain. (*Id.*). The plan was to continue wound care as ordered by the doctor. (*Id.*).

On October 11, 2020, Mr. Longo was seen by RN Jenrette. (*Id.* ¶ 20). He reported "I didn't take a shower today." (*Id.*). On examination, RN Jenrette cleaned his wound with peroxide and applied triple-antibiotic ointment, per orders. (*Id.*). She also noted Mr. Longo had no odor nor active drainage, denied pain, tolerated the cleaning well and voiced no complaints. (*Id.*). The plan was to continue wound care as ordered by the doctor. (*Id.*).

On November 9, 2020, Mr. Longo was medically cleared for work in food services through November 9, 2023. (*Id.* ¶ 21).

On November 20, 2020, Mr. Longo refused the flu shot because he "got ill last time [he] got it." (*Id.* ¶ 22). Marie T. Ondoua, LPN filled-out a refusal form. (*Id.*).

On January 10, 2021, Mr. Longo tested negative for tuberculosis. (*Id.* ¶ 23).

On January 22, 2021, CRNP Mungai completed a Preventative Risk Assessment Tool. (*Id.* ¶ 24). Per the record, Mr. Longo reported intermittent, arthritic lower back pain and right knee pain. (*Id.*). The plan was for his next Preventative Health Assessment to be completed in 3 years. (*Id.*).

On January 28, 2021, Mr. Longo was seen by LPN Connie Barber, who ordered Mr. Longo a Hepatitis panel and HIV lab test (blood work).  (*Id.* ¶ 25).   Dr. Leclerc approved the order on February 1.  (*Id.*).

On February 9, 2021, Amy Flatt Manning, PA attempted to see Mr. Longo to complete a routine health appraisal but had to reschedule the appointment due to enhanced quarantine measures.  (*Id.* ¶ 26).

On February 24, 2021, Mr. Longo was tested for COVID-19.  (*Id.* ¶ 27).

On February 25, 2021, Mr. Longo tested negative for the flu and COVID-19.  (*Id.* ¶ 28).

On March 1, 2021, Timothy Rutherford, PA noted in Mr. Longo's chart that he was seen on the sick line and documented the visit on March 3.  (*Id.* ¶ 29).  Per the March 3, 2021 note, PA Rutherford saw Mr. Longo at a sick call visit on March 1 and was just completing the note, but was unable to finalize and enter it at that time due to technical difficulties.  (*Id.*).  PA Rutherford noted that Mr. Longo was seen on the sick call line on the block during and complained of inflamed follicles across his face, arm, and left heel for less than 1 week.  (*Id.*).  He also complained of a pimple-like burn with no itch, discharge nor spreading and denied any attempt at self-treating the same.  (*Id.*).  On examination, PA Rutherford noted he had a rash by recent history from the chart.  (*Id.*).  His assessment was folliculitis.  (*Id.*).  The plan was to start antibiotics.  (*Id.*).  In addition, he discussed red flags with Mr. Longo, advised of the risks and benefits and Mr. Longo agreed to the treatment

plan. (*Id.*). He encouraged him by suggesting he could purchase similar medicines on commissary for future treatment, discussed avoiding medicines that may interact with treatment prescribed today, and advised him to return to the sick line if his symptoms worsened. (*Id.*).

On March 16, 2021, Mr. Longo had an eye appointment with the optometrist. (*Id.* ¶ 30).

On April 6, 2021, Mr. Longo consented to the EAU mRNA COVID-19 vaccine. (*Id.* ¶ 31).

On April 26, 2021, Mr. Longo was seen by CRNP Arguelles, who noted he requested refill of his medications for low back pain. (*Id.* ¶ 32). He reported he was in bed most of the time, even in the day, and denied any new discomfort at the time of this encounter. (*Id.*). CRNP Arguelles advised him to take his medications as prescribed. (*Id.*). In addition, CRNP Arguelles gave Mr. Longo instruction on proper use of his medications, including side effects, and advised him to seek medical care if his condition worsened and use commissary products with the same effects, if available. (*Id.*). On examination, Mr. Longo did not appear to be in acute distress. (*Id.*). CRNP Arguelles's assessment was low back pain. (*Id.*). Per the plan, CRNP Arguelles prescribed him Robaxin for 7 days, directed him to take Motrin as needed, perform routine exercise/ROM daily, and advised he would evaluate his response to treatment. (*Id.*).

On April 30, 2021, Mr. Longo was seen by CRNP Arguelles at a follow-up visit for his low back pain. (*Id.* ¶ 33). Mr. Longo complained he had more pain when he was lying on his bed. (*Id.*). He also reported that he has a family history of degenerative bone disease. (*Id.*). He denied recent trauma and denied any worsening of pain. (*Id.*). Additionally, CRNP Arguelles noted that Mr. Longo had only been taking the most recently prescribed medications for 2 days, and advised him to give it more time, recommended he undergo an X-ray, and put him on a bottom bunk restriction at the time. (*Id.*). On examination, Mr. Longo did not appear to be in any acute distress. (*Id.*). His assessment was low back pain. (*Id.*). Per the plan, Mr. Longo was to continue taking his Robaxin and NSAIDs as ordered. (*Id.*). CRNP Arguelles ordered a lumbar spine X-ray, entered the bottom bunk restriction, and directed that he return for a follow-up in 2 weeks. (*Id.*). Mr. Longo agreed with the plan of treatment. (*Id.*). CRNP Arguelles further advised Mr. Longo to seek medical care if his condition worsened and to use available commissary products with the same effect. (*Id.*).

On May 3, 2021, Mr. Longo was issued permanent eyeglasses. (*Id.* ¶ 34).

On May 4, 2021, Mr. Longo underwent lumbosacral spine X-rays. (*Id.* ¶ 35). Radiologist Scott Logan, M.D., reported no evidence of an acute osseous fracture; maintenance of the vertebral body heights, normal disc spaces, normal spinal alignment, no radiopaque foreign body, and no hardware. (*Id.*). Based on the limitations in the evaluation of spinal disease, especially soft tissues, ligamentous and disc disease, it was recommended that Mr. Longo's need for further evaluation with a CT scan or MRI should be

determined clinically.  (*Id.*).  The impression was there was no radiographic evidence of an

acute fracture or subluxation.  (*Id.*).

On May 13, 2021, PA Rutherford created a note in Mr. Longo's chart pertaining to

his May 13, 2021 sick call line appointment.  (*Id.* ¶ 36).  PA Rutherford noted that the

provider requested a follow-up for Mr. Longo's low back pain.  (*Id.*).  He further noted that he

reviewed Mr. Longo's chart and X-ray results which did not show any acute pathology and

no recent request for medication refills pertaining to his low back pain.  (*Id.*).  The plan was

for medical to await patient driven sick slip before evaluating Mr. Longo.  (*Id.*).

On May 18, 2021, Mr. Longo was seen by CRNP Arguelles.  (*Id.* ¶ 37).  He

complained of ongoing low back pain for the past 4 months and denied any recent injury.

(*Id.*).  CRNP Arguelles noted that Mr. Longo's recent spine X-ray result was unremarkable.

(*Id.*).  On examination, he observed Mr. Longo's back and noted that it was without any

spinal deformity/injury or costovertebral angle tenderness.  (*Id.*).  CRNP Arguelles's

assessment was back pain.  (*Id.*).  Per the plan, he prescribed Mr. Longo a 2- week

Celebrex prescription.  (*Id.*).  In addition, he advised Mr. Longo to take his medications as

prescribed, provided health teachings regarding the proper use of his medications and side

effects, advised he would evaluate his response to the treatment and that Longo may need

to be evaluated for physical therapy, and directed Longo to drop sick call if his condition

persists despite treatment and/or use available commissary products that have the same

effect [as his medications].  (*Id.*).  Mr. Longo agreed to the plan of treatment.  (*Id.*).

On May 27, 2021, CRNP Gordon noted in Mr. Longo's chart that Mr. Longo submitted a request to have his Celebrex switched from DOT (when the medication is dispensed by nurses on scheduled pill lines) to KOP (keep on person), and renewal of restrictions.  (*Id.* ¶ 38).  She further noted that his sick call slip was triaged, his chart was reviewed, he did not request to be seen that day, his medication was modified as requested, he would be notified of the same and his active restriction status during rounds if possible, and no further action was taken at that time.  (*Id.*).

On June 7, 2021, Mr. Longo was seen by Edwin Mungai, CRNP.  (*Id.* ¶ 39).  Mr. Longo complained of ongoing back pain and requested a renewal of his Celebrex medication.  (*Id.*).  On examination, Mr. Longo was alert and oriented and was not in any acute distress.  (*Id.*).  CRNP Mungai's assessment was chronic back pain.  (*Id.*).  Per the plan, Mr. Longo's medication was renewed, and it was noted that he would be considered for PT if his back pain continued.  (*Id.*).

On July 2, 2021, Mr. Longo was seen by PA Rutherford on sick call line.  (*Id.* ¶ 40).  Mr. Longo complained of ongoing back pain since April 2021.  (*Id.*).  He reported he noticed pains which were intermittent and associated with bilateral entire leg numbness and immobility at times, and claimed the last time he was unable to feel anything in his legs and move was on June 29.  (*Id.*).  He denied any other new symptoms (i.e., immobility, major weakness, falls, debilitating pains or loss of bowel/bladder, acute flare up that does not seem brought on by new, over, or excessive activity).  (*Id.*).  Mr. Longo asserted that

ibuprofen was of minimal to no help, and he had not been out to the yard due to restrictions. (*Id.*).  On examination, Mr. Longo was not in any acute distress, had a steady gait, his lungs were clear, etc. (*Id.*).  Examination of his back revealed that his paraspinal muscles in area of concern were tender to palpation with mild spasms. (*Id.*).  He had no major spinal tenderness, no weakness, and his deep tendon reflexes were equally intact with full ROM. (*Id.*).  PA Rutherford's assessment was lower back pain. (*Id.*).  He noted he reviewed Mr. Longo's X-rays with him, started him on a steroid taper trial, advised him to do stretches, and return to the MD line in 1 month for further care if he only receives minimal help from these interventions and experiences treatment-resistant lower back pain. (*Id.*).  After discussion, Mr. Longo agreed to the plan of treatment. (*Id.*).  PA Rutherford also encouraged him to purchase similar medicines from commissary for future treatment, avoid medications that interact with the treatment prescribed, and to return to the sick call line if his symptoms worsen and/or as needed. (*Id.*).  Mr. Longo was also scheduled to be seen on the doc line in 4 to 5 weeks for a follow-up for his treatment resistant lower back pain. (*Id.*).

On August 4, 2021, Mr. Longo was seen by CRNP Gordon. (*Id.* ¶ 41).  He complained of chronic back pain and requesting a second opinion from a spinal specialist. (*Id.*).  CRNP Gordon noted that Longo was prescribed Celebrex 100 mg twice daily as treatment for his pain, he was informed that he would be referred to the MD line to discuss his request. (*Id.*).  He denied any other needs at that time. (*Id.*).  CRNP Gordon examined

him, noting that Longo was able to rise from the bench and ambulate without difficulty. (*Id.*).

Her assessment was chronic pain. (*Id.*). The plan was to continue his Celebrex

prescription, as ordered, and for him to be seen on the MD Line for further assessment of

his chronic pain and his request for a second opinion from a spinal specialist. (*Id.*).

On August 9, 2021, PA Rutherford noted in Mr. Longo's chart that he was

inappropriately triaged to the sick call line after filing a DC-135A (Inmate Request to Staff

Member) regarding questions about his health (without describing a lack of DC-138A slips

on his block)[2]. (*Id.* ¶ 42). In response, Longo was directed to follow DOC policy by filing a

DC-138A to sign up for sick call. (*Id.*). PA Rutherford further noted that the slip was placed

in his medical records for mailing back to him. (*Id.*).

On August 17, 2021, PA Rutherford noted in Mr. Longo's chart that his sick call slip,

medical history, and chart were reviewed, his sick call slip was triaged appropriately, new

orders were entered, and, if able, Mr. Longo would be notified today during block-to-block

rounds. (*Id.* ¶ 43). He also noted that Mr. Longo requested to reschedule his MD Line

appointment for his chronic back pain. (*Id.*). More specifically, Mr. Longo noted that his

appointment was on August 10, he was not seen, and he had been rescheduled for

September 9. (*Id.*).

---

[2]     Per DC-ADM 820 Section 1, an inmate shall pay a $5.00 co-pay fee for any non-emergency
medical service provided at the inmate's request and the inmate shall sign an authorization form which
describes the medical service provided and the amount that his account will be debited. *See* DC-ADM 820
§ 1, available at: https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/820%20Co-
Payment%20for%20Medical%20Services.pdf (last accessed May 15, 2024). A DC-138A Cash Slip shall
be used for this purpose, indicating the type of medical service provided. *See id.* § 2.

On August 23, 2021, Mr. Longo was seen by PA Flatt on the sick call line.  (*Id.* ¶ 44).

He complained of continued low back pain, his recent X-ray was normal, reported he had

pain and occasional paresthesia, and denied recent injury.  (*Id.*).  Mr. Longo also requested

to see a doctor.  (*Id.*).  PA Flatt noted that he was in line for PT.  (*Id.*).  On examination, Mr.

Longo was alert, not in apparent distress, was ambulatory without antalgic gait, and

changed position without distress.  (*Id.*).  PA Flatt's assessment was for low back pain.

(*Id.*).  The plan was to issue Mr. Longo an abdominal binder, administer Naprosyn and

Robaxin as ordered, and schedule him to see the provider on September 9, 2021.  (*Id.*).  In

addition, she provided education to Mr. Longo and encouraged him to do stretching

exercises.  (*Id.*).  On this same date, Mr. Longo was issued a permanent abdominal binder.

(*Id.*).

On September 13, 2021, CRNP Gordon noted in Mr. Longo's file that he requested

to be seen by Dr. Voorstad for his chronic back pain.  (*Id.* ¶ 45).  In addition, she noted that

he reported that the NSAIDs are not helping the pain and he has been experiencing leg

numbness and described his pain as being "intense and I'm about to snap."  (*Id.*).  CRNP

Gordon advised she would contact administrative staff about rescheduling Mr. Longo's

appointment ASAP.  (*Id.*).  The plan was for him to be seen on the MD Line for an

appointment for his back pain and leg numbness resulting in falls.  (*Id.*).  CRNP Gordon

requested that he be scheduled with the first available physician.  (*Id.*).

On September 22, 2021, Jocelyn Ramirez Harrell, CRNP, noted that Mr. Longo's chart had been reviewed, he requested to see the MD line and his appointment request would be scheduled.  (*Id.* ¶ 46).  She further noted that Mr. Longo did not mention any other issues on his slip nor request to be seen and that he would be notified of his appointment during rounds/sick call.  (*Id.*).  The plan was to reschedule him for a doctor's line appointment.  (*Id.*).

On September 27, 2021, PA Rutherford noted in Mr. Longo's chart that his sick slip, medical history, and chart were reviewed, his sick slip was triaged appropriately, new orders were entered, and Mr. Longo would be notified during the block-to-block rounds today.  (*Id.* ¶ 47).  He further noted that Mr. Longo requested ground level, but did not request to be evaluated at the time and that medical would evaluate him if his symptoms persisted or worsened.  (*Id.*).

On October 4, 2021, CRNP Gordon noted in Mr. Longo's chart that Mr. Longo was inquiring about when he is due to renew his bottom bunk status and denied any other medical needs at that time.  (*Id.* ¶ 48).  She further noted that his chart was reviewed, and patient restrictions were effective until September 2022.  (*Id.*).  This information was provided to Mr. Longo.  (*Id.*).

On October 27, 2021, CRNP Ramirez noted in Mr. Longo's chart that he was inquiring about his doctor line appointment, which was scheduled for November 29, and

neither mentioned any other issues on his slip nor requested to be seen.  (*Id.* ¶ 49).  The plan was to notify him of his appointment during rounds/sick call.  (*Id.*).

On November 2, 2021, Mr. Longo tested negative for the flu and COVID-19.  (*Id.* ¶ 50).

On November 4, 2021, Mr. Longo's health information was scheduled to be transferred to the Snyder County Sheriff's Department on November 5 in advance of an apparent transfer on a writ.  (*Id.* ¶ 51).

Per a November 10, 2021 Medical Incident/Injury Report, while he was on an authorized temporary absence at the Union County Jail, an inmate entered Mr. Longo's cell requesting commissary, he informed the inmate he did not have any, and the inmate began punching him.  (*Id.* ¶ 52).  Following this, Mr. Longo was examined by Denise Bonetti, RN, a nurse at SCI Camp Hill.  (*Id.*).  On examination, Mr. Longo's vital signs were within normal limits.  (*Id.*).  His left eye and surrounding area were discolored and swollen but he denied any changes in vision or thought processes.  (*Id.*).  He also denied pain and his speech was clear and concise.  (*Id.*).  It was further noted that he had additional scratches on his face but reported that they were from shaving.  (*Id.*).  Also, his hands, knuckles and the remainder of his body was free of injury.  (*Id.*).  It was determined that Mr. Longo did not need any treatment following the nursing assessment and he was directed to follow-up on the sick call line as needed.  (*Id.*).

On November 11, 2021, Mr. Longo was seen by Denise Bonnetti, RN. (*Id.* ¶ 53). He complained that he got punched in the left eye on November 9. (*Id.*). Per the history, she noted that he claimed he was assaulted by an unknown inmate at Union City Jail when he was there on a writ. (*Id.*). On examination, RN Bonnetti noted was not in acute distress, his gait and posture were within normal limits, and he had edema. (*Id.*). Mr. Longo was returned to his block and scheduled to be seen by the provider at next day sick call. (*Id.*).

On November 16, 2021, Mr. Longo consented to taking the EUA mRNA COVID-19 vaccine. (*Id.* ¶ 54).

On December 13, 2021, Mr. Longo was seen by CRNP Gordon. (*Id.* ¶ 55). Timothy Rutherford, PA was also present for the entire exam. (*Id.*). At the visit, Mr. Longo reported seeing a maroon blood clot during a bowel movement on December 9. (*Id.*). He complained of bright red bleeding, diarrhea, diffuse abdominal pain that was worse during bowel movements, and lower back pain. (*Id.*). He also reported that his cousin had Crohn's disease, but he is unsure of whether any of his first-degree relatives had it. (*Id.*). PA Rutherford noted that on examination of Mr. Longo's abdomen, he had had normally active bowel sounds, no internal or external hemorrhoids were observed, and his anoscope exam was negative for blood, noticeable tears, or ulcerations. (*Id.*). CRNP Gordon's assessment was diarrheal stools, abdominal pain, gross blood in stools, lower back pain without injury, and second degree relative with irritable bowel disease ("IBD"). (*Id.*). The plan was to order labs, including antinuclear antibody (ANA), c-reactive protein (CRP), erythrocyte

sedimentation rate (ESR), tissue transglutaminase IgA (tTg-IgA), and total immunoglobin

(Iga) lab tests and a stool culture. (*Id.*). Hemoccult cards were also ordered. (*Id.*). If they

came back as abnormal, the plan was to place a GI consultation with collegial for a

colonoscopy. (*Id.*). Mr. Longo was directed to follow-up on the sick line in 1 week to review

his hemoccult card results. (*Id.*).

On December 29, 2021, Mr. Longo was seen by CRNP Ramirez on the sick call line

for a follow up on his hemoccult cards and blood work. (*Id.* ¶ 56). He stated his bloodwork

had not been completed nor were hemoccult cards given to him. (*Id.*). Longo also reported

ongoing episodes of loose stool. (*Id.*). On examination, it was noted that Mr. Longo was

alert, oriented, not in apparent distress, nontoxic, had moist mucous membranes, his gait

was steady, and his posture was erect. (*Id.*). CRNP Ramirez's assessment was for

frequent loose stools. (*Id.*). Per the plan, Longo was given hemoccult cards, sent for lab

work ordered by CRNP Gordon, and directed to return to the sick call line on January 7 to

discuss the results of his hemoccult and lab tests and a follow-up on his loose stools. (*Id.*).

Mr. Longo was educated on the same. (*Id.*).

Per the December 30, 2022 lab results, Teresa Stine, LPN noted that Mr. Longo's

hemoccult #1 and #2 tests were positive for blood in his stool and his hemoccult #3 test was

negative for blood in his stool. (*Id.* ¶ 57). Dr. Voorstad signed off on this record on

February 7, 2022. (*Id.*).

On January 7, 2022, Mr. Longo was seen on the sick call line for a follow-up to his ongoing diarrhea that began one month prior. (*Id.* ¶ 58). There, he complained of having as many as 10 episodes of diarrhea per day, saw dark red blood in his stool on occasion, and had abdominal pain located around his umbilicus and in his back. (*Id.*). Mr. Longo denied nausea, fever, chills, and weakness. (*Id.*). He also reported that he has been able to keep food and fluids down, is drinking 8 cups of water each day. (*Id.*). On examination, Mr. Longo was alert, awake, oriented, and not in apparent distress. (*Id.*). His mucous membrane was moist. (*Id.*). His vitals were stable, his heart had regular rate and rhythm, skin had good turgor, capillary refill within 2 seconds. (*Id.*). He had hyperactive bowel sounds in all 4 quadrants, diffuse tenderness to palpation, was negative for Rebound/McBurney's or Murphey's, and negative for hepatosplenomegaly. (*Id.*). CRNP Ramirez's assessment was diarrhea. (*Id.*). The plan was to perform a stool culture, prescribe him Imodium, and place a GI consult with collegial. (*Id.*). To this end, it was noted that his bloodwork was unremarkable with two positive hemoccult specimens. (*Id.*). Mr. Longo was educated on the same and directed to return to the sick call line for a follow up (i.e., to review his stool culture and a reassessment) on January 18. (*Id.*).

On January 14, 2022, CRNP Ramirez noted in Mr. Longo's chart that he received the result of the collegial request for gastroenterology. (*Id.* ¶ 59). She further noted that an alternative treatment plan was recommended for Mr. Longo to be reevaluated on the sick

line, he was already scheduled for the January 18, 2022 sick line, and no further action was needed at this time. (*Id.*).

On January 18, 2022, Mr. Longo was seen on the sick call line to discuss his stool culture results. (*Id.* ¶ 60). He complained that he continued to have several episodes of diarrhea a day and stated they occasionally will have some blood in them. (*Id.*). He also reported abdominal cramping and that he had been able to tolerate oral fluids, but denied fever, chills, weakness, nausea, and vomiting. (*Id.*). CRNP Ramirez reviewed Mr. Longo's stool culture results, which showed he had 4+ beta-hemolytic streptococcus group g. (*Id.*). On examination, Mr. Longo was alert, awake, oriented, and not in apparent distress. (*Id.*). His skin was nontoxic, warm, pink, and dry. (*Id.*). His capillary refill was within 2 seconds, and there was no tenting to his skin. (*Id.*). Mr. Longo's heart had regular in rate and rhythm, his lungs were clear to auscultation bilaterally, he had active bowel sounds in all 4 quadrants, and he had diffuse tenderness on palpation. (*Id.*). CRNP Ramirez's assessment was beta hemolytic strep. (*Id.*). The plan was to prescribe him Clindamycin as treatment. (*Id.*). Mr. Longo was educated on this and advised he would be seen on the sick line on Friday to reevaluate his abdominal pain/diarrhea. (*Id.*).

On January 20, 2022, PA Flatt noted in Mr. Longo's chart that Mr. Longo placed a request after not receiving Imodium. (*Id.* ¶ 61). PA Flatt noted that the order was discontinued after his gastrointestinal pathogen was identified. (*Id.*). She also noted that he

was presently being treated with clindamycin and is scheduled to be seen in follow-up

tomorrow. (*Id.*).

On January 21, 2022, Mr. Longo was seen by PA Flatt on the sick line for a follow-up

for diarrhea and abdominal discomfort. (*Id.* ¶ 62). Mr. Longo reported he had not improved,

but denied worsening symptoms, melena, and bloody stool. (*Id.*). He also reported he had

only taken 4 doses of the antibiotic thus far, denied fever and emesis, reported he was

eating and drinking, and noting abdominal discomfort involving his entire abdomen. (*Id.*).

Mr. Longo also complained of increased low back pain that has been present for more than

1 year. (*Id.*). He further reported that Robaxin did not help in the past and he had an

upcoming appointment on the physician line. (*Id.*). On examination, Mr. Longo was alert,

not in acute distress, had tenderness in all 4 quadrants, bowel sounds in all 4 quadrants, no

grimace was noted, and no rebound or rigidity. (*Id.*). On examination of his back, it was

noted that he had tender bilateral low back musculature but changed positions without

difficulty. (*Id.*). PA Flatt's assessment was for colitis and low back pain. (*Id.*). Per the plan,

Bentyl was ordered, they discussed his reason for not using Imodium, PA Flatt encouraged

him to continue to increase his fluids and taking ABX as prescribed. (*Id.*). PA Flatt also

advised that his labs (i.e., a comprehensive lab panel and amylase, serum, CBC, and

Lipase, serum clinical tests) were ordered and he was to place a sick call if there was no

relief. (*Id.*). PA Flatt also advised that Baclofen was ordered until his February 20, 2022

22

physician line follow up and encouraged him to perform his stretches.  (*Id.*).  Finally, Mr.

Longo was to follow up as needed.  (*Id.*).

On February 10, 2022, Mr. Longo was seen by PA Flatt on the sick call line.  (*Id.* ¶

63).  He complained of worsening severe low back pain with radiation, the abdominal binder

he used as a back brace was not supportive, and the analgesics were not beneficial.  (*Id.*).

He also reported he was rescheduled to see the physician for February 23 and denied injury

or complaint.  (*Id.*).  On examination, Mr. Longo was alert, not in apparent distress, had a

stable gait, and tender lower back musculature.  (*Id.*).  PA Flatt's assessment was for low

back pain.  (*Id.*).  Per the plan, she noted that no medications were prescribed, a back brace

with suspenders was requested, X-rays were ordered, he was educated on the same, and

he was scheduled for a February 2022 appointment.  (*Id.*).  Thereafter, PA Flatt ordered him

a lumbar spine X-ray to be taken within 1 week.  (*Id.*).

On February 11, 2022, Mr. Longo was issued an XL comfort form back support.  (*Id.*

¶ 64).

On February 11, 2022, Mr. Longo underwent an X-ray of his lumbosacral and lumbar

spines.  (*Id.* ¶ 65).  These X-rays were compared to his May 4, 2021 X-rays, and were

normal.  (*Id.*).

On February 22, 2022, CRNP Gordon noted in Mr. Longo's medical chart that Mr.

Longo was a no show for his scheduled MD Line appointment.  (*Id.* ¶ 66).

On February 24, 2022, Mr. Longo was seen by CRNP Ramirez on the sick call line.
(*Id.* ¶ 67).  He requested a physician evaluation about continual lower back problems.  (*Id.*).
He had a February 22 sick call appointment but was a no show and was subsequently
scheduled for the MD line with Dr. Voorstad on March 3.  (*Id.*).  On examination, Mr. Longo
was alert, awake, oriented, and nontoxic.  (*Id.*).  His breathing was even and unlabored, he
was hunched over with his hand on his back while speaking to CRNP Ramirez, and then
ambulated away to a correctional officer to pick up his pass with an erect posture, steady
and even gait.  (*Id.*).  CRNP Ramirez's assessment was chronic lower back pain.  (*Id.*).  The
plan was to have him seen on MD line as scheduled.  (*Id.*).  She also noted that he was
recently issued a new back brace and declined additional medication intervention at this
time.  (*Id.*).

On March 2, 2020, Mr. Longo was seen by Physical Therapist Eugene Zappa for
physical therapy.  (*Id.* ¶ 68).  Mr. Longo complained of chronic low back pain that limits his
tolerance to sitting, standing, and laying down.  (*Id.*).  He also reported multiple falls and
intermittent lower extremity numbness and that he is limited to 1-2 hours of sleep or awakes
to pain.  (*Id.*).  On examination, Mr. Zappa noted that Mr. Longo had significant pain with all
directions of movement and position, and tenderness to palpation over his spinal
musculature.  (*Id.*).  Mr. Zappa also observed that Mr. Longo was unable to tolerate supine,
range of motion, and standing long enough to perform exercises.  (*Id.*).  He had positive
straight leg raises bilaterally.  (*Id.*).  Mr. Zappa's assessment was chronic low back pain.

(*Id.*).  He recommended MD line follow up, and noted that he was unable to determine a course of plan due to evaluated movement being painful and lack of tolerance for any activity and discontinued Mr. Longo's physical therapy.  (*Id.*).

On March 7, 2022, Mr. Longo was seen by Dr. Voorstad for low back pain which he described as severe and present since early last year.  (*Id.* ¶ 69).  Mr. Longo clarified that his back pain has been ongoing since 2020, it went away and returned in April after he jumped from his top bunk.  (*Id.*).  Mr. Longo also described his back pain as severe and "feels like someone reaching inside and ripping out my spine," says after walking and making his legs feel like they are going to give out.  (*Id.*).  He also reported he fell in his cell once but did not seek acute medical attention.  (*Id.*).  He also complained he is taking over the-counter Tylenol and Motrin, without improvement, and received Baclofen for it a few months ago.  (*Id.*).  He also had plain X-rays last assessment year and last month without any abnormalities described.  (*Id.*).  On examination, Mr. Longo had a limp left leg, his spinal alignment was normal, and his lumbar flexion was normal, though he had pain from it. (*Id.*).  He also had some paraspinal muscular tenderness primarily left lumbar to relatively little pressure, his bilateral lower extremity strengths and deep tendon reflexes were normal, and he was on a number of psychotropics, including Abilify, Cogentin, Prazosin, and Zoloft. (*Id.*).  Dr. Voorstad's assessment was chronic back pain, which seemed more intermuscular and muscular, possibly myofascial.  (*Id.*).  Dr. Voorstad also counseled Mr. Longo on continued use of NSAIDS/Tylenol and discussed physical therapy with him.  (*Id.*).  The plan

was to prescribe Mobic 7.5 mg twice per day and on an as needed basis and refer him to

PT.  (*Id.*).  He further directed Mr. Longo to follow-up for his back pain on the MD line in

about 6 weeks.  (*Id.*).

On April 5, 2022, Mr. Longo received an eye exam.  (*Id.* ¶ 70).

On April 11, 2022, PA Flatt noted in Mr. Longo's chart that Mr. Longo placed a sick

call requesting a refill of Mobic, no acute complaint was mentioned, and he did not request

to see a provider.  (*Id.* ¶ 71).  PA Flatt further noted that Mr. Longo's medication was refilled

via nursing and that he would be notified.  (*Id.*).

On April 14, 2022, CRNP Gordon noted in Mr. Longo's medical chart that he

complained of ongoing lower back pain.  (*Id.* ¶ 72).  He reported picking up his Mobic

prescription yesterday after being without it for 2 weeks.  (*Id.*).  He also requested a second

mattress and "something to help [him] walk."  (*Id.*).  CRNP Gordon noted that Mr. Longo

was last seen by Dr. Voorstad in March and requested to see him back in 6 weeks. Per the

note, Mr. Longo was scheduled for a March 20 visit in error.  (*Id.*).  The plan was for the

clinical coordinator to change his appointment to April 18.  (*Id.*).

On April 18, 2022, Mr. Longo was seen by Dr. Voorstad for a follow-up for his back

pain.  (*Id.* ¶ 73).  Mr. Longo reported low back pain that was aggravated after he jumped off

the top tier last year.  (*Id.*).  Dr. Voorstad noted that he underwent plain X-rays without

abnormalities, takes Mobic, and was discontinued from PT within the last month because all

treatments aggravated his pain.  (*Id.*).  He also noted that Mr. Longo complained that his

pain was still bad, was across the lumbosacral area, and that the pain travelled to his hips.

(*Id.*).   On examination, Mr. Longo had a limp left leg, lumbar flexion caused pain, he had no

deformities, he was tender across his LS area, and bilateral sacroiliac.  (*Id.*).   Dr. Voorstad's

assessment was for chronic low back pain and possible sacroiliitis.  (*Id.*).   Per the plan, Mr.

Longo consented to and was administered a right sacroiliac steroid injection as treatment

for his low back pain, which he tolerated okay.  (*Id.*).   He was to follow up on the doctor line

in 2 weeks for low back pain.  (*Id.*).

On May 2, 2022, Mr. Longo was seen by Vanitha Abraham, M.D.  (*Id.* ¶ 74).  He

complained of low back pain for 1 year after lifting a 250-pound object working in the kitchen

in a different prison, bilateral lower extremity radiation, and problems with defecation.  (*Id.*).

On examination, Mr. Longo was able to walk on his heels but not his toes and his straight

leg test was up to 10 degrees, reflexes were dull, vitals were stable, HEENT was within

normal limits, neck was supple, lungs were clear, and heart had RRR. Dr. Abraham also

noted that Mr. Longo's central nervous system and his mental status was within normal

limits.  (*Id.*).   Dr. Abraham also noted that Mr. Longo was taking psych meds and his muscle

relaxants were not helping.  (*Id.*).   Dr. Abraham's assessment was for chronic back pain with

radiculopathy not responding to back injection and physical therapy.  (*Id.*).   The plan was to

continue his Mobic prescription, add Prednisone 10 mg once daily with food for 14 days,

and place a collegial consult for an MRI.  (*Id.*).   Dr. Abraham also directed Mr. Longo to

continue his back brace and follow up on the sick call line if his condition did not improve. (*Id.*).

On May 5, 2022, Mr. Longo received eyeglasses.  (*Id.* ¶ 75).

On May 10, 2022, Mr. Longo was seen by PA Riley, complaining of continued chronic low back pain with radiculopathy to the left leg.  (*Id.* ¶ 76).  PA Riley noted that Mr. Longo had been seen multiple times with multiple studies completed to include his L-Spine and autoimmune/rheum type labs and no significant abnormality seen.  (*Id.*).  On examination, Mr. Longo was in no apparent distress.  (*Id.*).  He had no edema, deformity or mass in his back and had full, active range of motion at the waist with discomfort, strength of lower extremity muscles was 5/5, patella reflexes are 2+, bilateral straight leg raise was negative.  (*Id.*).  PA Riley also noted that February 11, 2022 L-spine X-ray showed no evidence of an acute osseous fracture and his vertebral body heights were maintained, disc spaces were normal, and there was no evidence of misalignment.  (*Id.*).  PA Riley's assessment was low back pain.  (*Id.*).  He ordered Motrin 600 mg three times per day as needed.  (*Id.*).  He also noted that Mr. Longo has a pending MRI of the spine per his previous note and was advised of such, will return to care if there is no change in his condition or it worsens or otherwise follow up after his MRI for re-evaluation and adjustment of his treatment on an as needed basis.  (*Id.*).  Mr. Longo verbalized his understanding of the plan and that he would comply.  (*Id.*).

On May 10, 2022, Dr. Abraham noted in Mr. Longo's medical chart that his collegial consult for an MRI was deferred, and further evaluation and treatment was recommended. (*Id.* ¶ 77).

On May 25, 2022, PA Rutherford noted in Mr. Longo's medical chart that he was inappropriately triaged to the sick call line after filing a DC-135A regarding questions about his health (without describing a lack of DC- 138A's on block).  (*Id.* ¶ 78).  PA Rutherford further noted that the response to the DC-135A directed Longo to follow DOC policy by filing a DC-138A to sign up for sick line.  (*Id.*).  The slip was placed in his medical records for mailing back to Longo.  (*Id.*).  PA Rutherford also noted that Mr. Longo requested an update on collegial approval for an MRI but there was no new information at the time.  (*Id.*).

On June 3, 2022, Mr. Longo was seen by PA Riley.  (*Id.* ¶ 78).  PA Riley described him as follows:

> 28-year-old male with chronic low back pain is here with continued pain with radiculopathy to the left leg.  He has been seen multiple times with multiple studies completed to include L-spine and autoimmune/rheum type labs and no significant abnormality seen.  Is here today to check on MRI status as he states that he was seen on MD line and the provider ordered an MRI.

(*Id.*).  On examination, Mr. Longo was observed to be a well-nourished, well-developed adult male in no apparent distress.  (*Id.*).  PA Riley also reviewed his records, and his last note from May 10, 2022.  (*Id.*).  PA Riley's assessment was low back pain.  (*Id.*).  The plan was for Mr. Longo to be seen by the MD.  (*Id.*).  The possibility of an MRI had been deferred in favor of trying to treat him with topical lidocaine, which Mr. Longo had not tried, as

treatment for his pain. (*Id.*). PA Riley also educated Mr. Longo on his current and previous evaluations and studies, including that no significant abnormalities had been found. PA Riley also noted he reviewed Mr. Longo's special needs and restrictions. (*Id.*).

On June 20, 2022, Mr. Longo was seen by PA Riley. (*Id.* ¶ 80). PA Riley noted that Longo complained of chronic low back pain, and reported that he was seen by multiple providers with no significant abnormality seen, and he requested further evaluation and treatment. (*Id.*). PA Riley also noted that Mr. Longo had been tried on multiple medications to include oral and topical analgesics and none provided any significant level of relief, and he desires to receive medications that work. (*Id.*). On examination, PA Riley observed that Mr. Longo was a normal, well-developed, and not in apparent distress. (*Id.*). PA Riley's assessment was for other chronic pain. (*Id.*). The plan was to request that Mr. Longo be re-evaluated on the MD Line for continued evaluation recalcitrant low back pain to multiple meds with no abnormality found, and treatment. (*Id.*). PA Riley also noted he reviewed Mr. Longo's special needs and restrictions. (*Id.*).

On July 5, 2022, Mr. Longo was seen by Stacy Nolan, LPN for a restrictive housing and special management housing-health screening. (*Id.* ¶ 81). Per the record, Mr. Longo was being admitted to the RHU. (*Id.*). At the time, he was medically cleared for food service, no weightlifting, passive sports only, no intensive labor, no lifting more than 10 pounds, no work at heights/elevations, and lower bunk and ground level. (*Id.*). He received education on the medical, dental, and mental health sick call processes. (*Id.*). Per the plan,

there were no medication changes to direct observation (DOT), he was referred for routine psychology, and it was noted that no referral plan was needed.  (*Id.*).

On July 20, 2022, PA Rutherford made a progress note in Mr. Longo's medical chart. (*Id.* ¶ 82).  Per the Progress Note, Mr. Longo's sick slip, medical history and chart were reviewed.  (*Id.*).  Mr. Longo requested a lower bunk while in the RHU, which PA Rutherford noted had already been ordered.  (*Id.*).

On July 26, 2022, Mr. Longo was seen by Lisa Snyder RN for a medical release form to be completed.  (*Id.* ¶ 83).  Per the release, Mr. Longo had bottom bunk and bottom floor status.  (*Id.*).  His activities of daily living (ADLs) were as follows: no limited labor, no lifting more than 10 pounds, and no work at heights/elevations.  (*Id.*).  It was further noted that he could self-complete ADLs and wore glasses.  (*Id.*).  His chronic conditions were listed as: other specified bipolar and related disorder; unspecified trauma and stressor related disorder; medication induced postural tremor; dyspepsia, gastroesophageal reflux, no esophagitis; low back pain (dated 1/11/2017); human bite; and encounter for prophylactic measures, unspecified.  (*Id.*).  It was also noted that he was taking the following medications: Aripiprazole 10 mg once daily; Benztropine 1 mg twice daily; Lidocaine 5% ointment 4 times daily as needed; Prazosin 2 mg bid at bedtime; sertraline 100 mg once daily; and Sertraline 50 mg once daily.  (*Id.*).  The plan was for him to follow-up with his family physician as needed.  (*Id.*).

On July 27, 2022, CRNP Ramirez noted in Mr. Longo's medical chart that he submitted a sick call slip on July 24, complaining that he was on the top bunk with a lower bunk restriction due to chronic lower back pain, and requested a COVID-19 booster. (*Id.* ¶ 84). CRNP Ramirez further noted that the record indicated lower bunk housing with appropriate lower bunk restriction and the block would be notified of his lower bunk restriction. (*Id.*).

On August 19, 2022, Mr. Longo was seen by PA Rutherford on the sick call line. (*Id.* ¶ 85). Mr. Longo complained that his industrial back support was misplaced since his release from the RHU. (*Id.*). He also claimed he contacted security and was told they do not have his medical item. (*Id.*). He did not offer any new complaints. (*Id.*). On examination, it was noted that Longo was not in apparent distress. (*Id.*). PA Rutherford's assessment was for back pain. (*Id.*). He noted that he reviewed a healthcare item receipt, updated Mr. Longo's restrictions, and sent an email to nursing supervisors in an attempt to locate Longo's item in storage. (*Id.*). PA Rutherford also noted that medical would consider resupplying him with back support next week if they are unable find it. (*Id.*). PA Rutherford discussed red flags with Mr. Longo and advised him to return to the sick line if his symptoms worsen. (*Id.*). Mr. Longo voiced his understanding and was agreeable to the plan. (*Id.*).

On August 24, 2022, Mr. Longo was seen by CRNP Gordon, and requested a back brace replacement because his brace was not returned to him. (*Id.* ¶ 86). CRNP Gordon ordered him a new brace, and one was issued to him that day. (*Id.*). In a separate note, PA

Flatt noted that she discontinued Longo's prior existing back brace order in the system.
(*Id.*).

On September 8, 2022, Longo was seen by CRNP Ramirez at sick call for long standing history of chronic episodic lower back pain recalcitrant to different modalities of treatment, including Tylenol, Motrin, muscle relaxers, steroid, topical lidocaine, and physical therapy.  (*Id.* ¶ 87).  Mr. Longo reported he originally injured his lower back at SCI Retreat in the training room in the kitchen and injured it again while jumping down from the top bunk a few years ago.  (*Id.*).  Since then, he has what he describes as constant lower back pain that continues to get worse with shooting pain that goes down his bilateral legs which makes it difficult for him to have bowel movements.  (*Id.*).  He denied saddle anesthesia. (*Id.*).  However, he experiences pain when sitting and increased pain with bearing down. (*Id.*).  He also denied hard stools, but reported he only has bowel movements every few days due to the pain.  (*Id.*).  He also denied burning with bowel movements, blood in his stool, and issues with urination, including burning, changes in his urine stream, blood in his urine, and urine frequency.  (*Id.*).  CRNP Ramirez also noted that Mr. Longo had numerous X-rays in the past, with the most recent X-ray being February 2022 and unremarkable.  (*Id.*). Mr. Longo further denied any falls, weakness, chest pain, SOB, nausea, and vomiting.  (*Id.*). He stated he was seen on the MD line for this in the past.  (*Id.*).  However, he was frustrated and noted he was told that his psychiatric medications contraindicated certain neuropathic pain medications which might otherwise be an interaction in neuropath pain treatment with

his psychiatric medications. (*Id.*). Mr. Longo was alert, awake, oriented, not in apparent

distress, had no edema present to his bilateral lower legs, his gait had a mild limp, his

posture was erect, and he was present in the exam room with a back brace. (*Id.*). On

further examination, Mr. Longo had tenderness to palpation present to his lumber and sacral

spine, no tenderness present to cervical or thoracic lumbar region, no tenderness present to

his paraspinal muscles, no tenderness present to upper gluteus medius or gluteus maximus

muscles, (+) pain with straight leg raise bilaterally, no increased pain upon leg lowering, a

soft abdomen, etc. (*Id.*). His strength was 5/5, he was able to fully plantar and dorsiflex and

reflexes and sensation were grossly intact. CRNP Ramirez's assessment was for ongoing

lower back pain. (*Id.*). Per the plan, she discussed medications safety in terms of pain

management versus mental health stability with Mr. Longo, reviewed his recent X-ray

results with him, renewed his Motrin prescription, and advised she would request

rescheduling of the MD line appointment with the site medical director to address his low

back pain. (*Id.*).

On September 27, 2022, Theresa Shoffner, RN completed a medical release

summary. (*Id.* ¶ 88). Per the Release, Mr. Longo's restricted activities of daily living

included "no intensive labor" and "no lifting more than 10 pounds." (*Id.*).

On September 28, 2022, Mr. Longo was seen by Dr. Voorstad for a follow-up for his

chronic low back pain. (*Id.* ¶ 89). At the visit, Mr. Longo complained of doing very poorly,

complained of severe pain, and difficulty sleeping at night. (*Id.*). Mr. Longo identified his

lumbar spine as the area in question and stated that it was more towards the tailbone, and periodically radiated to his legs causing him to feel numbness. (*Id.*). Mr. Longo also reminded Dr. Voorstad that he was unable to tolerate any modality treatment with physical therapy. (*Id.*). He reported that his initial pain occurred after a 2020 injury, and was reaggravated due to him jumping from a top bunk in April 2021. (*Id.*). In addition, Mr. Longo reported he has no relief with sacroiliac joint injections nor various other medications and NSAIDS/Tylenol do not help. (*Id.*). Mr. Longo also complained that he was beginning to experience difficulties urinating and defecating. (*Id.*). Dr. Voorstad noted that Mr. Longo was taking psychotropics, including Aripiprazole, Cogentin, Prazosin, and Zoloft in addition to noting that no abnormalities were described on the plain X-rays of his lumbar spine taken in 2021 and earlier this year. (*Id.*). Mr. Longo otherwise denied joint pains or other pains in his upper back, neck, shoulders, arms, hands, knees, and feet. (*Id.*). On examination, Dr. Voorstad observed that Mr. Longo had a slow but normal gait, normal lumbar alignment, and tenderness over the bilateral sacroiliac joint and sacral area. (*Id.*). He had very limited lumbar flexion on request for movement, and complained of very severe pain. (*Id.*). Dr. Voorstad also noted that Mr. Longo was seated, grimacing while he passively brought his hips through flexion, noting the pain in his back, but not while Dr. Voorstad extended at the knees in passive range of motion. (*Id.*). He further noted that Mr Longo's bilateral lower extremity and reflexes were normal, and his plantar reflexes were normal. (*Id.*). Dr. Voorstad's assessment was chronic low back pain, which he noted as appearing to be more

at L5 vertebral area and sacral. (*Id.*). He further noted he did not think there were true

radicular symptoms or findings. (*Id.*). He also noted that he was more concerned with

myofascial pain, and ruled out muscle inflammation. (*Id.*). Dr. Voorstad prescribed a low

dose of Keppra HS, he and Longo discussed considering an upwards titration in the future.

(*Id.*). He also ordered labs to check his potassium and Aldolase levels. (*Id.*). He scheduled

him for a follow-up visit on the doctor line in 5 weeks. (*Id.*).

On October 3, 2022, PA Flatt noted in Mr. Longo's medical chart that he wrote a

request for low bunk and bottom tier to be removed. (*Id.* ¶ 90). She further noted that he

has chronic low back pain and was recently evaluated by the physician, his chart was

reviewed, lower bunk was renewed but not his lower tier, and he would be notified. (*Id.*).

Mr. Longo was not scheduled for a follow-up. (*Id.*).

On October 21, 2022, Mr. Longo consented to the COVID-19 vaccine. (*Id.* ¶ 91).

On December 5, 2022, Mr. Longo did not show up to the pill line for medications at

bedtime. (*Id.* ¶ 92). He was also called on the block but did not answer. (*Id.*). Mary

Harrison, RN executed a refusal form based on the no show. (*Id.*).

On December 7, 2022, Mr. Longo received dental treatment. (*Id.* ¶ 93).

On December 19, 2022, PA Rutherford reviewed Mr. Longo's chart/sick slip and brief

history/exam while and noted that Mr. Longo requested an update on the next M.D. line

appointment. (*Id.* ¶ 94). He noted that Mr. Longo was made aware that he was currently

scheduled for December 22. (*Id.*).

36

On December 27, 2022, CRNP Kimberly Cirri noted in Mr. Longo's medical chart that Mr. Longo placed a sick call stating he had a December 22, 2022 appointment with Dr. Voorstad but it was cancelled and he would like to see him due to back pain.  (*Id.* ¶ 95). CRNP Cirri further noted that Mr. Longo was already scheduled for a December 30, 2022 appointment.  (*Id.*).

On January 10, 2023, Mr. Longo tested negative for tuberculosis.  (*Id.* ¶ 96).

On January 3, 2023, Mr. Longo was seen by CRNP Gordon.  (*Id.* ¶ 97).  At the visit, he was inquiring when he will be seen by the physician for his back pain stating the Keppra previously prescribed is not effective.  (*Id.*).  CRNP Gordon informed Mr. Longo that he is scheduled for a January 19, 2023 appointment.  (*Id.*).  However, Mr. Longo requested an earlier appointment.  (*Id.*).  In light of this, CRNP Gordon decided to oblige Mr. Longo and place a request on his behalf.  (*Id.*).  Mr. Longo denied any other needs at that time.  (*Id.*). Again, the plan was for him to be seen on the provider line for a follow-up with Dr. Voorstad. (*Id.*).

On February 21, 2023, Timothy Rutherford, PA noted in Mr. Longo's medical chart that he reviewed his chart in relation to a sick call slip and that at that time inmate movement was prohibited due to a count issue.  (*Id.* ¶ 98).

On February 22, 2023, Mr. Longo was seen by Dr. Voorstad for a follow-up for his complaints of low back pain.  (*Id.* ¶ 99).  Per the record, Dr. Voorstad noted that he prescribed Mr. Longo Keppra 250 mg to be taken at bedtime, which Mr. Longo was no

longer taking and reported that it did not help. (*Id.*). At the visit, Mr. Longo described his pain as being very severe and especially bothersome at nighttime, keeping him from sleep, and seeming to radiate to the legs. (*Id.*). He also reported numbness in his legs. When asked about how his walking was, Mr. Longo stated "it is no better" while attempting to indicate that his gait is poor. (*Id.*). Mr. Longo also reported that he did not tolerate physical therapy before. (*Id.*). Finally, Dr. Voorstad noted that Mr. Longo's lumbar spine X-rays from earlier last year and the year prior showed no abnormalities. (*Id*). Prior to the examination, Dr. Voorstad observed Mr. Longo sitting on the bench in the assessment area, bent over when called but quickly straightened and stood up, walked with a normal gait, and not complaining later that he has a chronic limp. (*Id.*). On examination, Dr. Voorstad noted that Mr. Longo's lumbar alignment appeared normal, he showed an uneven extremely minimal flexion and declined to go further. (*Id.*). He had some lumbar discomfort and lumbar vertebral tenderness to palpation, but his bilateral lower extremities seemed to have normal strength, including in his feet, and his deep tendon reflexes in the patellar and Achilles tendons were normal bilaterally. (*Id.*). Dr. Voorstad further noted that Mr. Longo seemed to have an exaggerated shuffling gait, which was different when he left the room, and then sat on the bench and stood up without difficulty after Dr. Voorstad got some papers for him. (*Id.*). Dr. Voorstad's assessment was chronic low back pain. (*Id.*). He noted that Mr. Longo's severity of complaints was out of proportion to exam findings, especially his gait which switched at the end of the visit. (*Id.*). He further noted that they discussed the

following: (1) Mr. Longo may have fibromyalgia or myofascial type pain syndrome, (2) the

possibility of renewal of PT, which Mr. Longo declined, (3) that Mr. Longo's Keppra 250 mg

prescription could be changed from before bed to twice per day, which Mr. Longo ultimately

accepted, (4) that Mr. Longo's prior studies were normal and there is very little clinical

suspicion for significant neurologic deficit or other significant spinal disease, and (5)

continued exercises, including that they may be beneficial if this is fibromyalgia.  (*Id.*).  With

respect to the latter, Dr. Voorstad advised that this could be under the care of the physical

therapist, but Mr. Longo was not further interested in physical therapy.  (*Id.*).  He also

recopied the instructions for home exercises for his back pain.  (*Id.*).  Thereafter, Dr.

Voorstad ordered Mr. Longo's new Keppra 250 mg prescription and scheduled him to be

seen on the doctor line for a follow-up on his chronic low back pain in about 6 weeks.  (*Id.*).

On April 5, 2023, Mr. Longo was seen by CRNP Ramirez on the sick line.  (*Id.* ¶

100).  CRNP Cirri was also present at the visit.  (*Id.*).  Per the record, Mr. Longo requested

an update to lower bunk status.  (*Id.*).  CRNP Ramirez noted that he had a longstanding

history of lower back pain and was currently being seen/managed on the MD line.  (*Id.*).

CRNP Ramirez further noted that Mr. Longo reported he fell while climbing up on the top

bunk yesterday.  (*Id.*).  More specifically, he reported he was standing on the stool when he

slipped due to the chronic numbness he feels in his bilateral lower legs and struck his left

hip on the ground.  (*Id.*).  He denied hitting his head and further reported he was able to

help himself up after the fall yesterday.  (*Id.*).  He also reported he did not notice any

bruising on himself and, therefore, did not feel like he needed to notify nursing or any correctional officer. (*Id.*). Mr. Longo further denied taking blood thinners, denied numbness, or tingling aside from what he described as chronic for him, and stated that his main complaint is his request for renewal of his lower bunk status. (*Id.*). On examination, Mr. Longo was alert, awake, and oriented. (*Id.*). His gait was steady, he had an erect posture. (*Id.*). He had 5/5 strength to the upper and lower extremities, and deep tendon reflexes graded as 2+ (a brisk response), no edema to the bilateral legs, and no bruising. (*Id.*). As for his hips, there was no erythema or open wounds to the present left hip, his pelvis was stable, there was some tenderness present in his left hip upon palpation, no pain with ranges of motion, but some muscle tightness with a straight leg raise (SLR) to the bilateral lower legs. (*Id.*). CRNP Ramirez's assessment was left leg pain. (*Id.*). Per the plan, CRNP Ramirez placed Mr. Longo on bottom bunk status for 2 weeks, prescribed him Ibuprofen, and ordered him a left hip X-ray. (*Id.*).

On April 6, 2023, Mr. Longo underwent an X-ray of his left hip, which was normal. (*Id.* ¶ 101).

On May 17, 2023, Sara Cauler, LPN completed a medical release summary. (*Id.* ¶ 102).

On June 8, 2023, Mr. Longo received dental treatment. (*Id.* ¶ 103).

On June 9, 2023, Mr. Longo was seen by Kimberly Cirri, CRNP. (*Id.* ¶ 104). Per record, Mr. Longo requested to see Dr. Voorstad for a follow-up on his chronic back issues.

(*Id.*).  As such, CRNP Cirri noted she would request a doctor line appointment at this time and that Mr. Longo was not seen on the sick line at that time.  (*Id.*).  The plan was for Mr. Longo to be added on the doctor line for his chronic low back issues.  (*Id.*).

On June 27, 2023, Mr. Longo was seen by Dr. Voorstad at a follow-up visit for his Complaints of chronic back pain symptoms.  (*Id.* ¶ 105).  Dr. Voorstad noted that Mr. Longo had physical therapy, but it ended because he did not tolerate any movements that the therapist was trying with him.  (*Id.*).  He further noted that Mr. Longo reported that his pain continues and feels like it is still very severe and likely worsening.  (*Id.*).  At this time, Mr. Longo had been taking Keppra 250 mg two times per day, but the prescription expired a few prior and Longo reported that it was not working anyway.  (*Id.*).  Dr. Voorstad also noted that Mr. Longo was not using any nonsteroidal anti-inflammatories.  (*Id.*).  In addition, Mr. Longo further described his pain as being present for a couple of years, partly attributed it to heavy lifting at his previous institution, and stated that it was aggravated a couple years ago after he jumped from a top bunk.  (*Id.*).  He also reported that he was recently using a top bunk, had a fall, and his back was aggravated since then.  (*Id.*).  Mr. Longo specifically described his pain as primarily at the midline lower back at the lumbosacral area, radiating down the legs at times, which Dr. Voorstad noted as sounding more like it was occurring in his left leg more than his right.  (*Id.*).  Mr. Longo also reported episodes of numbness if he walks "too much," with it occurring more so in his left leg, and having feelings of instability and fear of walking.  (*Id.*).  At the visit, Dr. Voorstad observed Mr. Longo.  (*Id.*).  He noted that Mr.

41

Longo sat calmly in the waiting area. (*Id.*).  Upon observing Mr. Longo stand, he noted that

he had an awkward gait with some limp on the left leg and tending to keep his knees "rather

stiff and not bend them or raise them at all." (*Id.*).  On examination, Dr. Voorstad observed

that Mr. Longo had a slightly accentuated dorsal kyphosis[3] on Mr. Longo's lumbar spine and

lower lumbar vertebral and sacral tenderness. (*Id.*).  In addition, Dr. Voorstad noted he was

unable to assess Mr. Longo's full lumbar flexion, as Mr. Longo exhibited only a limited

amount and related that it was painful. (*Id.*).  He noted that Mr. Longo's right lower

extremity strength was 5 out of 5 throughout and his movements were normal. (*Id.*).  As for

his left lower extremity, Dr. Voorstad observed some slight weakness against resistance

with hip flexion extension and plantar flexion and dorsiflexion and noted that Mr. Longo's

strength in the left lower extremity was probably a 5 out of 5. (*Id.*).  He further noted that Mr.

Longo's dependent reflexes in the patellar and Achilles reflexes were normal on both sides,

his bilateral straight leg testing seemed to cause some "pressure" feeling in the lower back,

and he described it as painful on the left. (*Id.*).  Dr. Voorstad's assessment was complaints

of ongoing pain in the lower back. (*Id.*).  He again noted that Mr. Longo's previous lumbar

and sacral X-rays were normal, he had potential weakness in the left leg but, again, it was

somewhat equivocal, and Mr. Longo had not tolerated physical therapy. (*Id.*).  The plan was

to review Mr. Longo's case with his superiors [site and regional or state medical directors]

---

[3]   Kyphosis is defined as "an exaggerated, forward rounding of the upper back." *See* Mayo Clinic, Diseases & Conditions, available at: https://www.mayoclinic.org/diseases-conditions/kyphosis/symptoms-causes/syc-20374205 (last accessed May 15, 2024).

for consideration of referral to a spine specialist for further evaluation.  (*Id.*).  Dr. Voorstad

further noted that Mr. Longo was not interested in any further Keppra at that point.  (*Id.*).

They also discussed the importance of continued use of NSAIDS for some analgesia, and

ordered Naproxen.  (*Id.*).  Mr. Longo was also scheduled for a follow-up for his back pain on

the doctor line in 2 to 3 weeks.  (*Id.*).

On June 27, 2023, Dr. Voorstad placed a consult request for Mr. Longo to be

scheduled for an offsite office visit with orthopedics for his chronic low back pain.  (*Id.* ¶

106).  Per the record, Dr. Voorstad noted that Mr. Longo had chronic low back pain for 2 to

3 years.  (*Id.*).  He further noted that Mr. Longo described this pain as severe pain in the

midline lower lumbar to the sacrum, radiating to his legs and alternating legs but more often

in his left leg, and attributed it to heavy lifting a few years ago and jumping off top bunks.

(*Id.*).  Dr. Voorstad also noted that Mr. Longo also claimed a sense of numbness in his legs

at times if he walks too much and experiencing a sense instability, has slight weakness on

confrontation, his reflexes were normal and equal throughout his bilateral lower extremities,

his bilateral leg tests provoke discomfort in his bilateral lower extremities, and he has an

awkward limping gait.  (*Id.*).  Dr. Voorstad further noted that Mr. Longo's plain X-rays from

February 2022 were normal, Mr. Longo failed PT due to various movements creating too

much pain, has taken various pain medications (i.e., NSAIDS and Keppra) without

improvement, the sacroiliac injection did not help.  (*Id.*).  This was approved on behalf of the

state medical director as of July 5, 2023.  (*Id.*).

II.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a).  "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once such a showing has been made, the non-moving

party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P.

56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III.   Discussion

Defendants move for summary judgment on the following grounds: (1) Longo failed to establish an Eighth Amendment inadequate medical care claim; and (2) Longo's medical malpractice claim fails.  (Doc. 41).  The Court addresses each argument below.

### A.   Eighth Amendment Claim

Longo alleges that Defendants Voorstad and Arguelles provided inadequate medical care for his back pain.  (Docs. 1, 27).

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Id.* at 104; *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official manifests deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05. "[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000).

An inmate's claims against members of a prison medical department are not viable under § 1983 when the inmate receives continuing care, but believes that more should be done and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle*, 429 U.S. at 107. Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

Here, there is no evidence to permit the trier of fact to find that Defendants Voorstad and Arguelles acted with deliberate indifference to Longo's serious medical needs. While

Longo asserts that Defendants Voorstad and Arguelles failed to provide adequate medical care for his back pain, the record is replete with evidence that he received continual medical care for his condition.  As set forth in detail above, Longo received comprehensive medical treatment in response to his complaints of back pain.  Specifically, the record before the Court evinces that Longo received regular medical visits, Defendant Voorstad treated Longo on five occasions, Defendant Arguelles treated Longo on three occasions during the relevant time period, and numerous other medical professionals treated Longo.  The record reflects that Longo underwent X-rays and an MRI, received physical therapy, was provided an abdominal binder, back support, and back brace, and was prescribed numerous medications including Ibuprofen, Robaxin, Motrin, Tylenol, Celebrex, steroids, Prednisone, Naprosyn, Baclofen, Mobic, Keppra, and Lidocaine (topically and injected).  Further, Defendants continued to monitor Longo's back pain and medication regimen.  The medical records reveal that medical staff took prompt steps to investigate Longo's complaints, he had numerous follow-up visits, received many prescriptions for medication, underwent various diagnostic testing, and received assistive devices.  The record clearly shows that Longo received continuous and responsive medical treatment throughout his incarceration.

Longo appears to dismiss the comprehensive medical treatment he received, and his primary complaint is that he received substandard medical care.  This argument implies Longo's disagreement with a particular course of treatment and his own lay opinion regarding the proper course of treatment for his pain.  However, mere disagreement with

the selected course of treatment is not grounds for a medical deliberate indifference claim. *See Thomas v. Dragovich*, 142 F. App'x 33, 36 (3d Cir. 2005) (nonprecedential) (citing *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)). To the extent that Longo asserts that Defendants' professional judgment was deficient, this also is not enough to rise to the level of a constitutional violation, and courts will not second guess whether a particular course of treatment is adequate or proper. *See Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (citing *Inmates of Allegheny Cnty. Jail*, 612 F.2d at 762). And, even if some medical professionals would disagree as to the appropriate treatment for Longo's condition, the treatment selected by Defendants Voorstad and Arguelles would not rise to the level of deliberate indifference. *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.").

The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989). Longo has failed to meet this burden. It is clear on the record that Longo received extensive medical treatment

48

for his back pain.  Defendants Voorstad and Arguelles are therefore entitled to an entry of

summary judgment on Longo's Eighth Amendment medical care claim.

### B.    Medical Negligence Claim

Under Pennsylvania law, medical negligence "can be broadly defined as the

unwarranted departure from generally accepted standards of medical practice resulting in

injury to a patient, including all liability-producing conduct arising from the rendition of

professional medical services." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 254-

55 (2003) (internal citations and quotations omitted).  Thus, a plaintiff must establish a duty

owed by the physician or medical personnel to the patient, a breach of that duty, that the

breach was the proximate cause of the plaintiff's injury, and that the damages suffered were

a direct result of the harm.  *Toogood,* 573 Pa. at 254-55.  In addition, "[w]ith all but the most

self-evident medical malpractice actions there is also the added requirement that the plaintiff

must provide a medical expert who will testify as to the elements of duty, breach, and

causation." *Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 199 (2006); *see

also Brady v. Urbas*, 111 A.3d 1155, 1162 (Pa. 2015) ("Except in the most obvious cases of

negligence (such as where a gauze pad is left inside a patient's body), expert testimony is

necessary to establish the standard of care."); *Toogood*, 573 Pa. at 254-55 ("Because the

negligence of a physician encompasses matters not within the ordinary knowledge and

experience of laypersons a medical malpractice plaintiff must present expert testimony to

establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." (internal citations and quotations omitted)).

Pennsylvania Rule of Civil Procedure 1042.3 further requires a plaintiff alleging professional negligence to file a certificate of merit within 60 days of filing the complaint. PA. R. CIV. P. 1042.3. The certificate must include one of the following: a written attestation by "an appropriate licensed professional" that there is a "reasonable probability that the care, skill or knowledge exercised or exhibited" by the defendant "fell outside acceptable professional standards," and that this was the cause of the plaintiff's injuries; a statement that the claim against the defendant is based only on the professional negligence of those for whom the defendant is responsible; or a statement that expert testimony is unnecessary for the plaintiff's claim to proceed. PA. R. CIV. P. 1042.3(a)(1)-(3). Should a plaintiff certify that expert testimony is unnecessary, "in the absence of exceptional circumstances the attorney is bound by the certification and, subsequently, the trial court shall preclude the plaintiff from presenting testimony by an expert on the questions of standard of care and causation." PA. R. CIV. P. 1042.3(a)(3). Failure to file a certificate of merit is fatal to a plaintiff's claim. PA. R. CIV. P. 1042.7.

Here, Longo appears to assert that he has satisfied the requirements of Pennsylvania's certificate of merit requirements by stating under Rule 1042.3(a)(3), that "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim." (Doc. 27, pp. 3-4; *see also* Doc. 22-1, p. 2; Doc. 22-2, p. 1). The Pennsylvania

50

Rules of Civil Procedure clearly state that a plaintiff is bound by his certification that "an

expert is unnecessary for the prosecution of the claims, in the absence of exceptional

circumstances."  PA. R. CIV. P. 1042.3(a)(3).  The Rules further state that as a result of such

certification, "the trial court shall *preclude the plaintiff from presenting testimony by an*

*expert* on the questions of standard of care and causation."  *Id.* (emphasis added); *see also*

*Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011) ("[T]he

consequence of…filing [a certificate of merit] is a prohibition against offering expert

testimony later in the litigation, absent exceptional circumstances." (internal quotations

omitted)).  *Pro se* plaintiffs are not excluded from the binding and preclusive effects of a

section (a)(3) certification.  *Illes v. Beaven*, No. 1:12-CV-0395, 2012 WL 2836581, at *4

(M.D. Pa. July 10, 2012) (explaining that the *pro se* plaintiff's (a)(3) certification that "he

does not need expert testimony precludes him from presenting such testimony").  Nor does

a plaintiff's *pro se* status constitute an "exceptional circumstance" sufficient to override the

expert testimony prohibition.  *Cuevas v. United States*, Civil Action No. 09-43J, 2013 WL

4500470, at *10 (W.D. Pa. Aug. 21, 2013) *aff'd*, 580 F. App'x 71 (3d Cir. 2014).

        In this case, as stated above, Longo filed certificates of merit in which he declared:

"expert testimony of an appropriate licensed professional is unnecessary for prosecution of

the claim against this Defendant."  (Doc. 27, pp. 3-4; Doc. 22-1, p. 2; Doc. 22-2, p. 1).  As

these certifications fall within section (a)(3) of the Pennsylvania Rules of Civil Procedure,

Longo is therefore barred from offering expert testimony later in this litigation.  Again,

Pennsylvania law requires expert testimony to establish a claim for medical negligence. Therefore, without the ability to present expert testimony, Longo is unable to establish a prima facie case for medical negligence, and therefore, cannot succeed on this claim.

Longo, however, appears to argue that expert testimony is unnecessary and seems to urge this Court to apply the exception to the requirement of expert testimony in medical negligence cases.  As mentioned briefly above, the Pennsylvania Supreme Court has defined a narrow exception to the expert testimony requirement where "the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons, also conceptualized as the doctrine of *res ipsa loquitur*." *Toogood*, 573 Pa. at 255 (internal citations omitted).  Adopting the language of the Restatement (Second) of Torts, Section 328D, the Pennsylvania Supreme Court has stated that *res ipsa loquitur* applies when three conditions are met, "(a) *either a lay person is able to determine as a matter of common knowledge, or an expert testifies*, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event." *Toogood*, 573 Pa. at 262 (citing Restatement (Second) § 328D) (emphasis added).

Longo argues that the circumstances of this case are such that a lay person could easily understand them and, therefore, fall within the stated exception. The Court finds that the medical issues presented by Longo require medical testimony and do not fall within the exception to the requirement of expert testimony. Arriving at a medical diagnosis and then determining the appropriate medical treatment plan is analytical and requires medical judgment. In evaluating the prison medical personnel's opinions and treatment of Longo's back pain, the fact finder would need more than his common knowledge and experience as a layperson. Thus, the Court finds that the narrow exception does not apply, and medical expert testimony is required to prove both the standard of care, the breach thereof, and causation for Longo's medical negligence claim. *See Cuevas*, 2013 WL 4500470, at *10, *aff'd*, 580 F. App'x 71 (3d Cir. 2014) (finding that a determination regarding whether delayed diagnosis of a foot injury constitutes medical malpractice "involves complex issues of medical care" and, therefore, the narrow exception to the expert testimony requirement does not apply). The Court finds that Defendants Voorstad and Arguelles are entitled to summary judgment on the state law negligence claim, and the motion will be granted as to this claim.

## IV. Conclusion

Based on the foregoing, the Court will grant the Rule 56 motion (Doc. 39) by Defendants Voorstad and Arguelles, and enter judgment in their favor.  A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: May ____, 2024